IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REBEKAH NOECKER, | : | |
| Plaintiff | : | Civil Case |
| | : | |
| v. | : | |
| | : | |
| THE READING HOSPITAL AND | : | No. 5:08-cv-03553-LS |
| MEDICAL CENTER | : | |
| Defendants | : | |

MEMORANDUM

**Stengel, J.**                                                                                                                                               **January 27, 2010**

      Rebekah Noecker was employed as a licensed practical nurse ("LPN") at the Reading Hospital and Medical Center. In October, 2006, she informed Reading Hospital she was pregnant and her ability to work would be limited because she could not lift more than twenty-five pounds. Because her job as an LPN required an ability to lift more than twenty-five pounds, Reading Hospital gave her "odd jobs" to perform. Most of the jobs were associated with a telephone survey Reading Hospital was conducting. On January 12, 2007, Reading Hospital informed Ms. Noecker it no longer had work for her to perform because the survey was ending, and her last day would be January 19, 2007. On January 19, 2007, Ms. Noecker began a leave of absence from Reading Hospital. She filed this employment discrimination action.

      The Reading Hospital filed a motion for summary judgment. For the reasons set forth below, I will grant its motion.

## I. BACKGROUND

Ms. Noecker is an LPN. Statement of Undisputed Material Facts of Plaintiff, Rebekah Noecker at ¶ 1, Noecker v. The Reading Hospital and Medical Center, No. 08-3553 (E.D. Pa. filed July 19, 2009) [hereinafter Plaintiff's Undisputed Facts]. She was employed as an "LPN-MEDS" in the rehabilitation unit of the Reading Hospital. Ms. Noecker was hired as a part-time employee in April 2006, and became a full-time employee in September 2006. Id. at ¶ 3; Defendant's Statement of Undisputed, Material Facts at ¶ 1, Noecker v. The Reading Hospital and Medical Center, No. 08-3553 (E.D. Pa. filed July 15, 2009) [hereinafter Defendant's Statement of Facts].

On October 11, 2006, Ms. Noecker gave her supervisor, Barbara Combs, a note from her gynecologist providing Ms. Noecker could not lift more than twenty-five pounds. Defendant's Statement of Facts at ¶ 30.; Plaintiff's Reply to Defendant's Statement of Undisputed Material Facts at ¶ 30, Noecker v. The Reading Hospital and Medical Center, No. 08-3553 (E.D. Pa. filed July 29, 2009) [hereinafter Plaintiff's Response to Defendant's Facts]. The following week, at Ms. Combs request, Ms. Noecker presented Ms. Combs with a note from an obstetrician, confirming Ms. Noecker could not lift more than twenty-five pounds.[1] Defendant's Statement of Facts at ¶ 31;

---

[1] Ms. Noecker's job responsibilities included assisting patients to and from their beds, and helping them ambulate. Deposition of Rebekah Noecker at 56-57, 77. The job description includes "[p]osition entails a great deal of walking, standing; may need to assist with moderate to heave lifting. Good physical and mental health required." Exhibits to Rebekah Noecker's Deposition at Exh. 7 at EECO-0106. If a patient fell, the nurse would assist the patient and take "part of the patient's weight by placing her own arms around the patient and sliding the patient

2

Plaintiff's Response to Defendant's Facts at ¶ 31.

In October 2006, Ms. Combs left Ms. Noecker a message on Ms. Noecker's home answering machine stating:

> we will have you do follow-up phone calls, but we're not sure how long that will keep you busy. Also, Reading Hospital does not have any light-duty so-to-speak type jobs here. When all these side jobs are taken care of you will be officially off work . . . we can't have you being a med nurse or something like that because this will open a whole can-of-worms.

Defendant's Statement of Facts at ¶ 32; Plaintiff's Response to Defendant's Facts at ¶ 32. Ms. Noecker began receiving lists of odd jobs to do at work, including making follow-up phone calls, which were a part of a survey Reading Hospital was conducting. Ms. Noecker also handled admissions and discharges, patient education, and filled medications when the registered nurses attended daily meetings. Defendant's Statement of Facts at ¶¶ 35-40; Plaintiff' Response to Defendant's Facts at ¶¶ 35-40.

On January 12, 2007, Kay Nichols-Wolfe and John Spillane met with Ms. Noecker to inform her that her duties would end on January 19, 2007.[2] Defendant's Statement of Facts at ¶ 44; Plaintiff' Response to Defendant's Facts at ¶ 44. On January 13, 2007, Ms.

---

down her legs to the floor." Rebekah Noecker's deposition at 77-78; Barbara Combs Deposition at 116-117. Ms. Noecker alleges she always had assistance if patients required more than minimal assistance, Plaintiff's Response to Defendant's Facts at ¶ 15, and if an emergency had arisen requiring her to lift beyond the restrictions, she would have done so and acted in violation of her medical restrictions. Defendant's Statement of Facts at ¶ 70; Plaintiff's Response to Defendant's Facts at ¶ 70.

[2] Ms. Noecker's duties were ending because the phone survey she was helping to conduct was concluding. Rebekah Noecker's Deposition at 110.

Noecker sent an email to Robert Myers, then-assistant vice-president of human resources, explaining she had been informed she was "no longer needed on the floor," and her last day would be the following Friday. She stated she had viewed the Reading Hospital's "Modified Duty Accommodating Duty Program" policy on the intranet and questioned why the policy was not being applied to her. Defendant's Statement of Facts at ¶ 46; Plaintiff' Response to Defendant's Facts at ¶ 46.

On January 17, 2007, Ms. Noecker met with Mr. Spillane and Ms. Nichols-Wolfe to discuss the Modified Duty Program. Defendant's Statement of Facts at ¶ 48; Plaintiff' Response to Defendant's Facts at ¶ 48. Ms. Nichols-Wolfe and Mr. Spillane told Ms. Noecker the "Modified Duty Accommodating Duty Program" applied only to work-related illnesses or injuries.[3] Id. On January 17, 2009, Ms. Noecker gave Ms. Nichols-Wolfe a third doctor's note which restricted her from lifting, pushing, and pulling less than or equal to twenty-five to thirty-five pounds. Defendant's Statement of Facts at ¶ 49; Plaintiff' Response to Defendant's Facts at ¶ 49.

On March 2, 2007, Ms. Noecker received a letter from Karen L. Kissinger, Benefits Administrator at Reading Hospital, stating Reading Hospital's records indicated

---

[3] The Reading Hospital's Personnel Policy No. 388, provides a "Temporary Duty Program" and a "Modified Duty Accommodating Duty Program." Defendant's Motion for Summary Judgment at Exh. C, Noecker v. The Reading Hospital and Medical Center, No. 08-3553 (E.D. Pa. filed July 19, 2009). The Temporary Duty Program's purpose was "[t]o provide temporary duty for employees who are restricted from their regular work due to a work-related injury/illness." Id. at 388:1. The Modified Duty Accommodating Duty Program's purpose, however, was "[t]o provide an appropriate work situation for employees who, due to injury or illness, have work restriction that are six months or longer." Id. at 388:3.

4

Ms. Noecker was on an absence of work from January 20, 2007 through July 1, 2007, and such absence did not qualify under the Family and Medical Leave Act. Defendant's Motion at Exh. 2 at Exh. 11. The letter explained Ms. Noecker would receive a bill for the full costs of all medical expenses when she was on unpaid leave. Id. Following receipt of this letter, Ms. Noecker spoke with someone at Reading Hospital concerning her medical benefits and COBRA. Defendant's Statement of Facts at ¶ 52; Plaintiff' Response to Defendant's Facts at ¶52. Plaintiff gave birth to twins on May 3, 2007. Defendant's Statement of Facts at ¶ 54; Plaintiff' Response to Defendant's Facts at ¶ 54. A month or two later, she began receiving medical bills. Id.

Following the birth of her twins, Ms. Noecker visited the rehabilitation unit. Rebekah Noecker Deposition at 171. Following this visit, Valerie Geyer, Ms. Comb's replacement as nurse manager, called Ms. Noecker. Id. Ms. Geyer asked whether Ms. Noecker would be returning to work. Id. Ms. Noecker told Ms. Geyer to call Ms. Noecker's attorney. Id.

On May 8, 2007, Ms. Noecker filed a charge of discrimination with the Equal Employment Opportunity Commission, which stated she held the position at the Reading Hospital from April 3, 2006 through "current" and was on a leave of absence effective January 19, 2007. Defendant's Statement of Facts at ¶ 59, 62; Plaintiff' Response to Defendant's Facts at ¶ 59, 62.

On June 28, 2007, Ms. Noecker received a letter from Mr. Myers, then-Assistant

Vice-President of Human Resources. The letter informed her that her leave of absence time had reached its limit, and, if she was unable to return to work, her status as an active employee would come to an end. Defendant's Statement of Facts at ¶ 55; Plaintiff' Response to Defendant's Facts at ¶ 55. If she was unable to return, but wanted to be considered for re-instatement or re-hire, she could submit a letter of resignation, indicating this wish. Id. Ms. Noecker did not contact Reading Hospital after the June 28, 2007 letter, and did not submit a letter of resignation. Defendant's Statement of Facts at ¶¶ 56, 58; Plaintiff' Response to Defendant's Facts at ¶ 56, 58. She was cleared by her physician to return to work in the third week of July. Defendant's Statement of Facts at ¶ 57; Plaintiff' Response to Defendant's Facts at ¶ 57.[4]

## II.     STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is "genuine" when a reasonable jury could return a verdict for the non-moving party based on the evidence in the record.

---

[4] Brandi Miller, Ms. Noecker's sister's sister-in-law, also had been hired as an RN at the Reading Hospital. Defendant's Statement of Facts at ¶ 71; Plaintiff' Response to Defendant's Facts at ¶ 71. When she became pregnant, she presented her supervisor with a note restricting her to lifting no more than thirty pounds. Ms. Miller was placed on a leave of absence without pay.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" when it could affect the outcome of the case under the governing law. Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating "to the district court that there is an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must view the evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Anderson, 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Id. at

252. If the non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit the moving party's version of events against the opponent, even if the quantity of the moving party's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

### III. DISCUSSION

#### A. Timeliness

Ms. Noecker timely filed her complaint. On January 12, 2007, Ms. Nichols-Wolfe and Mr. Spillane informed Ms. Noecker her last day of work would be January 19, 2007. On January 19, 2007, Ms. Noecker went on a leave of absence without pay. On May 8, 2007, Ms. Noecker filed her complaint of discrimination with the Equal Employment Opportunity Commission and Pennsylvania Human Relations Commission. This was within the 180 day statute of limitations.

On an October 2006 voice mail, Ms. Combs informed Ms. Noecker she would not be able to work once the odd jobs, which included making phone calls and assisting with administrative tasks, ended. However, there is no evidence establishing Ms. Noecker knew when the jobs would end, or establishing the jobs would end prior to her being able to return to work in her regular position. Therefore, the statute of limitations did not begin to run until January 12, 2007, the date Reading Hospital informed Ms. Noecker that

8

her last day would be the following Friday. See Lamb-Bowman v. Delaware State Univ., 1999 WL 1250889, at *6 (D.Del. 1999) (to determine "whether an adverse employment decision is definitive . . . and has been explicitly communicated to the employee, the Court looks to the clarity and consistency of the communications regarding the adverse employment decision"); contra Jakimas v. Hoffmann-LaRoche, Inc., 485 F.3d 770, 779 (3d Cir. 2007) (noting the limitations ran when the plaintiffs received letters of termination, noting "a final decision had been made to terminate their appointments.").[5]

B. **Gender/Pregnancy Discrimination**

Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et al., prohibits employment discrimination based on an individual's sex. Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 364 (3d Cir. 2008) (citing 42 U.S.C. § 2000e-2(a)). "The prohibition is breached 'whenever an employee's pregnancy [or related medical condition] is a motivating factor for the employer's adverse employment decision.'" Id. (quoting In re Carnegie Ctr. Assoc., 129 F.3d 290, 294 (3d Cir. 1997)). "The [Pregnancy Discrimination Act] does

---

[5] Defendant also alleges Ms. Noecker failed to exhaust her administrative remedies regarding her hostile work environment claim and her retaliation claim. Because I will grant Reading Hospital's summary judgment motion because no genuine issue of material fact exists and Reading Hospital is entitled to judgment as a matter of law, I need not address whether Ms. Noecker exhausted her administrative remedies. See Mathers v. Hermann, 2008 WL 1914781, at *20 n.23 (E.D. Pa. Apr. 30, 2008) (not addressing failure to exhaust argument because Plaintiff's claim was "flawed on its merits"); Lignore v. Hosp. Univ. of Pa., 2006 WL 1804571, at *6 n.12 (E.D. Pa. June 28, 2006) (not addressing whether plaintiff had exhausted administrative remedies because plaintiff failed to offer any evidence of discrimination).

9

not, however, require preferential treatment for pregnant employees. Instead, it mandates that employers treat pregnant employees the same as non-pregnant employees who are similarly situated with respect to their ability to work." Id. (citing In re Carnegie Ctr. Assoc., 129 F.3d at 297).

To establish a prima facie case of gender discrimination, a plaintiff must show "(1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; (4) under circumstances that give rise to an inference of discrimination." The elements of the prima facie case, however "must not be applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination." C.A.R.S. Protection Plus, 527 F.3d at 364 (quoting Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996)).

If a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to produce a legitimate nondiscriminatory reason for the action. C.A.R.S. Prot. Plus, Inc., 527 F.3d at 364. The burden then shifts back to the plaintiff to demonstrate this legitimate nondiscriminatory reason is pretext for discrimination. Id.

Reading Hospital does not dispute Ms. Noecker was a member of a protected class and was subject to an adverse employment action. Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 22-23, Noecker v. The Reading Hospital and Medical Center, No. 08-3553 (E.D. Pa. filed July 19, 2009). It maintains Ms. Noecker was not qualified for the position and the adverse employment action did not

occur under circumstances giving rise to an inference of discrimination. Id. In addition, it alleges it produced a legitimate nondiscriminatory reason, i.e., Ms. Noecker could not perform the job, and Ms. Noecker failed to produced sufficient evidence to establish pretext. Id. at 23-24.

A fair-minded jury could not return a verdict for the plaintiff on the evidence presented. Ms. Noecker was not qualified for the position, and her departure did not occur under circumstances giving rise to an inference of discrimination. She could not perform the required work because she could not lift more than twenty-five pounds.[6] Defendant's Statement of Facts at ¶ 30-31; Plaintiff's Response to Defendant's Facts at ¶ 30-31. When Reading Hospital no longer had duties for her to perform, it placed her on a leave of absence.[7] Defendant's Statement of Facts at ¶ 44; Plaintiff's Response to Defendant's Facts at ¶ 44; Rebekah Noecker's Deposition at 110. Following the birth of Ms. Noecker's twins, Reading Hospital called her and sent her letters requesting information concerning her return date. See, e.g., Defendant's Motion at Exh. 2 at Exh.

---

[6] Ms. Noecker gave the Reading Hospital notes from her gynecologist and obstetrician stating she could not lift more than twenty-five pounds. Defendant's Statement of Facts at ¶ 30-31; Plaintiff's Response to Defendant's Facts at ¶ 30-31. She claims she could have performed her work duties without lifting more than twenty-five pounds, and, if a patient had fallen, she would have ignored her doctor's restriction. The hospital, however, should not be faulted for refusing to allow Ms. Noecker to perform duties which may have required her to go against her doctor's restrictions, even if this would be a rare occurrence.

[7] Ms. Noecker was not terminated. Rather, as she stated in her EEOC Complaint, she was placed on a leave of absence. See Defendant's Motion for Summary Judgment at Exh. 2 at Exh. 19.

11

11; Defendant's Motion at Exh. 2 at Exh. 13. She failed to respond to these requests. The last correspondence from the Reading Hospital even informed Ms. Noecker she could state in her resignation letter she would like to return to the Reading Hospital in the future. Defendant's Motion at Exh. 2 at Exh. 13.

Ms. Noecker fails to establish a genuine issue of material fact. Ms. Noecker alleges Reading Hospital's "Modified Duty Accommodating Duty Program," should have applied to her. Although the policy's purpose is "[t]o provide an appropriate work situation for employees who, due to injury or illness, have work restrictions that are six months or longer," Defendant's Motion at Exh. C at 388:3, the policy does not contemplate pregnant employees. To be considered for the program, "a member of the Reading Hospital's Physiatry Department . . . must determine that the employee has reached maximum medical improvement with some permanent work restrictions." Id. at 388:3-388:4. Ms. Noecker's work restrictions were not permanent restrictions.

Accordingly, I will grant the Reading Hospital's motion for summary judgment as to Ms. Noecker's gender/pregnancy discrimination claim.

### C. Retaliation

To establish a prima facie case of retaliation, the plaintiff must establish "(1) she engaged in protected activity; (2) the defendant took a materially adverse action against her; and (3) there was a causal connection between the protected activity and the

employer's adverse action." Wilson v. Young Windows Inc., 2009 WL 564955, at *10 (E.D. Pa. March 3, 2009) (citing Weiler v. R&T Mech., Inc., 255 Fed. Appx. 665, 667-68 (3d Cir. 2007)).[8]

Ms. Noecker alleges she engaged in protected activity on January 13, 2008 and January 17, 2009, when she inquired into why the Reading Hospital's modified duty policy did not apply to her. She alleges she suffered an adverse employment action because her employment was terminated on January 19, 2009. Ms. Noecker alleges she establishes causal connection between her inquiry and the adverse employment action because she was fired two days after this inquiry.

On January 12, 2009, Reading Hospital informed Ms. Noecker that her last day would be on January 19, 2009. Defendant's Statement of Facts at ¶ 44; Plaintiff's Response to Defendant's Facts at ¶ 44. She then sent an email and engaged in discussions about why Reading Hospital's modified duty policy did not apply to her. Defendant's Statement of Facts at ¶ 46; Plaintiff's Response to Defendant's Facts at ¶ 46. Her last day remained January 19, 2009. In her memorandum she states she engaged in "meeting with higher and higher levels of management culminating in a meeting with [Mr.] Myers on January 17, 2007." Brief of Plaintiff, Rebekah Noecker, in Opposition to Motion for Summary Judgment of Defendant, the Reading Hospital and Medical Center

---

[8] "Protected activity includes filing Charges of Discrimination or making complaints about discriminatory employment practices." Wilson, 2009 WL 564955, at *10 n.10 (citing Abramson v. William Paterson College, 260 F.3d 265, 287-88 (3d Cir. 2001)).

at 16, Noecker v. The Reading Hospital and Medical Center, No. 08-3553 (E.D. Pa. filed July 29, 2009) [hereinafter Plaintiff's Memorandum]. The emails and testimony discussing her inquiries into the modified duty policy, however, occurred after January 12, 2007, which is the day she was informed her last day would be January 19, 2007.

Because Ms. Noecker did not engage in protected activity until after she was informed she would be placed on a leave of absence, she fails to established this leave of absence was retaliation for engaging in protected activity. Accordingly, I will grant the Reading Hospital's motion for summary judgment as to Ms. Noecker's retaliation claim.

    **C.**    **Hostile Work Environment**

To establish a hostile work environment claim, the plaintiff must establish: "(1) the employee[] suffered intentional discrimination because of [her] sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999) (quoting Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990)).

Noecker alleges "[she] was a pregnant female, and the actions, by upper management at [the Reading Hospital], had the devastating impact of marginalizing [her] to trivial, dead end, menial work, which was embarrassing and humiliating to her as a

certified professional." Plaintiff's Memorandum at 19-20. In addition, in support of her hostile work environment claim she states "the hostile work environment was ongoing from the day that [Ms.] Noecker advised [Ms.] Combs that she was pregnant, to being told there would be no work for her, to having the news of her pregnancy to [Ms.] Nichols-Wolfe being greeted with 'Oh shit!' to finally being terminated after meeting with [Ms.] Nichols-Wolfe, [Mr.] Spillane, and [Mr.] Myers."

Mere offhand comments do not support a hostile work environment claim. Caver v. City of Trenton, 420 F.3d 243, 263 (3d Cir. 2005). In addition, to determine whether conduct is severe and pervasive, courts may evaluate "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." Id.

Ms. Noecker does not allege frequent or severe conduct and does not establish any "remarks" interfered with her work performance. Moreover, the alleged conduct would not detrimentally affect a reasonable person. I will grant Reading Hospital's summary judgment motion as to the hostile work environment claim.[9]

---

[9] "Constructive discharge occurs when 'an employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 316 n.4 (3d Cir. 2006) (quoting Goss v. Exxon Office Sys. Co., 747 F.2d 885, 887 (3d Cir. 1984)). This requires "a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." Id. (quoting Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir. 1992)). Because Ms. Noecker's work conditions did not create a hostile work environment, she cannot maintain a constructive discharge claim.

An appropriate order follows.